182 So. 127

**ANDRUS et al. v. EUNICE BAND MILL CO., Inc.**

**No. 34617.**

May 30, 1938.

Charles C. Jaubert, of Lake Charles, for appellants.

Pecot & Bauer, of Franklin, for appellee.

ODOM, Justice.

The issues involved in this litigation are correctly stated in the opinion written by the trial judge. He has reviewed and analyzed the testimony. We have carefully checked the record to see whether he overlooked any issue raised by the pleadings or any material testimony. We find that he did not. He clearly states his conclusions and the reasons upon which they are based. His conclusions are so completely in accord with ours that we adopt his opinion and make it our own.

## Opinion of the Trial Judge.

"Morgan D. Andrus and others sued the Eunice Band Mill Company, Inc., successor, by change of name only, of Roy O. Martin Lumber Company of Eunice, to recover the sum of $29,595.58, claimed to be due them under a contract of sale of timber. The defendants company filed an exception of no right or cause of action which was sustained by the predecessor of the present incumbent on the bench. On appeal to the Supreme Court, the judgment of this court was reversed, the exception overruled, and the case remanded, to be proceeded with according to law and consistent with the views expressed in the judgment of the Supreme Court. See 185 La. 403, 169 So. 449. The case has now been heard on the merits and submitted on briefs.

"The contract sued upon was executed by the various parties from Nov. 5th to 13th, 1926. Under this contract the plaintiffs sold to the defendant all of the merchantable timber suitable for sawmill purposes, of specified species and dimensions, on a certain tract of land, at a fixed price per thousand feet for each specie, the logs to be scaled on the banks of the Mermentau River by representatives of both parties, and to be paid for by defendant as cut and scaled; that is, the contract stipulates that the purchase price shall be paid $3,000 cash. upon acceptance of the contract, the balance to be paid every two weeks, as the timber is cut and scaled, with privilege granted to defendant to reimburse itself for the $3,000 cash payment after $9,000 has been paid out of the purchase price of timber thereafter cut. It is also stipulated that the contract within which to cut and remove the timber.

"The contract further provides that if at the end of eighteen months, there remains on the tract any merchantable timber suitable for sawmill purposes, the defendant company is obligated to pay for same in a lump sum on the stumpage basis fixed in the contract, the quantity remaining to be established by a joint estimate to be made within thirty days of the expiration of the first eighteen months. After this estimate is made, the defendant

company is to have an additional twelve months to remove the remaining timber, but payment therefor has to be made within thirty days after the estimate is made. On this part of the contract, the plaintiffs claim an amount due of $30,070.03, less a credit of $688.65 of the original $3,000 paid at the execution of the contract.

"The contract also provides that 'It is understood that the severance tax shall be paid by purchaser. All taxes, other than severance tax, for the year 1926, on the property herein conveyed shall be paid by the vendors, and for the year 1927, the purchaser shall pay all taxes on the property herein conveyed.' In addition to the claim for the timber which the plaintiffs allege the defendant failed to take and pay for, they also demand $214.20 for taxes for the year 1927 which they allege they paid, and which they now claim was applicable to the timber; thus making the total net amount of their demand under the contract $29,595.58.

"To the demand for the value of merchantable timber suitable for sawmill purposes of the species and dimensions specified in the contract alleged to have been left on the land by the defendant at the expiration of the eighteen months from the date of the contract, the defendant company has interposed three defenses, namely: (1) a general denial that any timber which should have been taken under the contract was left on the land other than that timber which was estimated and paid for; (2) that Morgan D. Andrus, one of the plaintiffs, was the duly authorized representative of the plaintiffs and that

he released or authorized the release of all the land covered by the contract; and (3) that if Morgan D. Andrus was not the duly authorized representative of the plaintiffs, that plaintiffs held him out as such, accepted the benefits of his acts in their behalf, acquiesced in and ratified his acts, and are now estopped to deny his authority, particularly after having waited an unreasonable length of time to do so.

"To support their claim for unpaid timber, plaintiffs introduced in evidence two timber estimates: one made on October 7, 1926, by J. G. Roberts (identified as 'P-18'), and another made on October 17, 1936, by Walter Goss (identified as 'P-12'). The first purports to show the timber on the tract just about the time the contract was entered into, and the latter purports to show the quantity of merchantable timber that was on the land in July, 1928, after the defendant ceased its logging. For purposes of easy comparison, the court appends to this judgment a summary, in columnar form, of these two estimates and of the amount of timber it was stipulated on the trial had been cut.

"The court addresses itself first to the Roberts' estimate, and the first fact that strikes its attention is that the estimate is made on the basis of taking in timber 10″ and up, except tupelo which is divided into timber of 10″ and up to 16″, and from 16″ up; whereas under the contract it was only the pine which took in logs from 10″ and up; and the other logs were all to be 15″ and up, except cypress which took in 14″ and up. From the testimony of the timber men who testified, both for the

plaintiffs and the defendant, and by the exercise of ordinary judgment it is easy to understand that a timber estimate taking in trees as small as ten inches in diameter is worthless as an estimate on a contract calling only for logs fourteen and fifteen inches and up at the small end. In answer to a direct question, Mr. Roberts himself, the estimator, replied that he could not tell how much cypress timber there was on a 14″ basis, because his estimate was on a 10″ basis; and, likewise, he testified that he did not know how much of the other timber there was on the basis of 15″, as called for by the contract, for the reason that his estimate was on a 10″ basis. It is a significant fact that he estimated the pine on a 10″ basis and found 308,000 feet; and the defendant had purchased the pine on a 10″ basis, and it cut and paid for 416,682 feet of pine. In other words, on the only specie as to which the Roberts' estimate and the contract are on the same basis, the defendant cut and paid for considerably more than the estimate called for.

"There are other facts which can be gathered by a comparison of the estimates which convince the court that the Roberts estimate can be given no weight in establishing the claim of the plaintiffs. For instance, on cypress he estimated 1,590,000 feet; the defendant cut 674,119 feet; and Mr. Goss estimated only 25,000 feet left. On tupelo Mr. Roberts estimated a total of 2,480,000 feet; the company cut 275,486 feet; and Mr. Goss found, or estimated, only 1,500,000 feet left. On those two species, the Roberts estimate is far above the amount cut plus the estimate of Goss. On

the other hand, as pointed out above, on pine the estimate of Mr. Roberts is far below the amount cut plus the estimate of Goss. The same is true of Mr. Roberts' estimate on red gum. On a 10″ basis he estimated 80,000 feet; whereas the defendant cut out 67,947 feet, and Mr. Goss estimated 138,000 feet left, and both of the latter figures are on a 15″ basis. It may be observed, too that the Roberts' estimate is made in such round figures, all multiples of at least one thousand, that on its face it does not recommend itself to the court.

"The estimate of Mr. Goss is of no greater probative value. In the first place, it was made on October 17, 1936, retrospectively to July, 1928; and secondly, it is based entirely on logs of ten-foot lengths. As to the first objection, Mr. Roberts, the first estimator of the plaintiffs, testified emphatically that he did not think anybody could estimate at a given date how much timber of certain sizes grew on a tract of land ten years previously. This was also the testimony of the timber witnesses for the defendant. The determination in 1936 of the amount of timber of certain specified sizes in 1928 involved the question of how much each species had grown in the intervening period. Mr. Goss stated that he had allowed for two inches of growth on all. The witnesses on timber for the defendant, although two of them were its employees, another, Mr. Thistlethwaite, had no interest in the matter, testified that such timber would grow about four inches in that time, or one-half an inch in diameter per year. All of the witnesses, in-

cluding those for the plaintiff, agreed that young timber would grow more per year than old trees, and that the growth of all would depend upon other things, such as moisture, how close the trees were together, etc. Mr. Thistlethwaite, who stated that his company had one of the largest hardwood reserves in the country, testified that from his company's own experience in observing actual growth, a great number of trees grew five inches in ten years.

"As indicated above, there is another serious objection to the value of the Goss estimate. It is based entirely on logs of ten-foot lengths. The evidence conclusively shows that hardwood is not logged or estimated on such a basis. In fact, Mr. Goss himself admitted on the stand that ordinarily in logging not over one per cent of the logs are as short as ten feet. Some of the other witnesses placed this percentage as high as two to five per cent; but they all agreed that they had never heard of an estimate made on a basis of ten-foot logs, for logs usually ran sixteen, fourteen or twelve feet. They satisfied the court that an estimate of a ten-foot basis is of no value in the present controversy. At least, it is too unsatisfactory to serve as a basis on which to bottom a monied judgment.

"A cousin of the plaintiffs' testified that in 1926 he offered them $17,865.00 for certain of the timber on the land, but for all of the particular species, without limitation as to sizes or dimensions; and he admitted that he had never seen the contract sued upon and had no idea what timber was supposed to be taken by the defendant un-

der the contract; and his testimony proved nothing in the case.

"For a plaintiff to recover on a claim of this kind—to secure a monied judgment—it is necessary for him to prove his claim at least to some degree of certainty and definiteness; and that has not been done in this case. The court is of the opinion that the plaintiffs failed utterly to sustain their burden of proof and even if defendants had not introduced any evidence, the demand of plaintiffs would have to be rejected. But the defendant did introduce the direct and unequivocal testimony of three qualified timber men to the effect that in the early part of 1928 there was no merchantable timber left on the land suitable for sawmill purposes, of the species and dimensions set out in the contract, other than that which had been scaled and paid for by the defendant company.

"Under the second and third headings of defendant's defense the facts are briefly these. Mr. Morgan D. Andrus, one of the plaintiffs, was in charge of the scaling of the logs for his co-plaintiffs and himself. He had employed one G. C. Jordan, a timber man, to assist him, particularly to 'hold down Patterson' as he expressed it. Patterson was in charge of the operations for the defendant. Jordan had first been employed by the defendant, but had had an altercation and fight with Patterson; and he then became the employee of Mr. Andrus.

"When the logging operations were nearing completion, Patterson, as representative of the defendant, and Andrus and Jor-

dan, as representatives of the plaintiffs, went over the tract and entered into an agreement in general terms as to what timber under the contract was left on the tract. That agreement is dated Sept. 20, 1927 (identified as 'D-2'), and is accompanied by an estimate of certain logs and trees left on a part of the tract (identified as 'D-4'). For these logs and trees the plaintiffs were issued a credit memorandum and were duly paid therefor. Mr. Andrus admitted on the witness stand that he told the other Andrus heirs, the other plaintiffs, that he had signed this agreement and estimate; and he further admitted that none of them had objected to anything he did, so far as he knew.

"On January 7, 1928, Patterson and Jordan went to the home of Isaac Andrus, another of the heirs, where Morgan D. Andrus then was, for the purpose of getting him to go with them to make the final estimate of whatever timber was left under the contract. Jordan was then in the employ of the Andrus heirs. He testified that Morgan D. Andrus had told him 'Jordan, we will go in the woods and if there is anything left that they will have to pay for we want them to scale it and pay for it, either standing or on the ground.' The day was cold and the water so deep in the woods that only Patterson and Jordan finally went out, Andrus being too old to go under the conditions. A final estimate was made of what was left in logs not previously scaled and of standing trees, which was signed jointly by Patterson for the defendant and by Jordan for the plaintiffs

(identified as 'D-6'), and the plaintiffs were duly paid therefor.

"In the opinion of the court, the agreement and estimate of September 20, 1927, with the estimate of January 7, 1928, constitute a substantial compliance of the sale contract with regard to what was to be done at the end of eighteen months after the execution of the contract. The plaintiffs have attempted to deny Morgan D. Andrus' authority to bind them on any estimate, but in view of the fact that from almost the beginning of operations he was the only man with whom the defendant dealt with in regard to cutting and scaling the timber, and that the Andrus heirs held him out as their representative or permitted him to act as such; that they permitted him to hire Jordan, to whom he gave written orders on the company for payment of his compensation, which the defendant honored and deducted from the payments made to the plaintiffs; and that they accepted the settlements on the estimates which he agreed to with Patterson and Jordan; they should not now be heard to complain of his actions, particularly after having waited what the court considers an unreasonable time.

"Some time after the defendant had settled with the plaintiffs, pursuant to an exchange of letters (identified as 'P-3' and 'P-4') some of the plaintiffs went to defendant's office in Eunice to discuss the contract, or, as expressed by the president of the defendant company 'they seemed to come to me for information because they only got indirect information from some of

the other brothers they did not speak to.' He further testified that he told them all the timber called for under the contract had been removed or paid for, and that they seemed to be satisfied. Not one of the plaintiffs testified contrary to this. This was in the latter part of 1928, and not until two years later, in the latter part of 1930 or early in 1931, a letter was received by the defendant company from an attorney in Lake Charles, representing the plaintiffs about the contract. The president of the defendant company, Mr. Mays, went to Lake Charles, submitted his files to him; and the attorney told the plaintiffs they had no case. This was admitted by them on the witness stand. It was not until three years later, in 1934, when the present attorney of the plaintiffs was employed, that the defendant company was notified that the plaintiffs would not accept the settlement made under the agreement and estimates of Morgan D. Andrus; and then the filing of this suit followed, on October 26, 1934, more than six years after the expiration of the original eighteen month period of the contract, when the estimate was to be made of any timber on the land coming under the contract. Under the circumstances, it would be utterly inequitable to permit the plaintiffs to disavow the acts of their representative; particularly in view of the fact that they still have, and can sell at their pleasure, whatever timber, if any, that may be left on the tract. See Succession of Gilmore, 154 La. 105, 97 So. 330, and cases there cited; also Fred G. Jones & Co. v. Sanford, 163 La. 799, 112 So. 726; and see also Burrus Mill & Elevator Co. v. Eunice Grain Co., 182 La. 475, 162 So. 48, and cases there discussed.

"That brings the court to a consideration of the demand for taxes. The only evidence introduced in support of this claim is what purports to be a certificate from the Assessor of the Parish showing that the property of D. D. Andrus Estate '560 acres of wood and swamp land' was assessed for the year 1927 at a valuation of $5,600, on which there is written in pencil 'Millage 40.25 Total Tax $236.38;' a certain tax receipt in the name of 'Mrs. Clara E. Castex Estate' for the year 1929 showing a valuation of $76.00 for a one-thirtieth interest in the same land; and another receipt in the name of 'Isaac E. Andrus & Co-heirs' for the year 1930 showing a valuation of $380.00 for a one-sixth interest in the same land. Because, according to the foregoing receipts for the respective part interests therein, this entire land was assessed for only $2,280 for the years 1929 and 1930, and it was assessed for $5,600 for 1927, counsel for the plaintiffs argues that the difference in the two assessments, $3,320, represents the assessment of the timber for 1927; and by applying the millage of 40.25 found written in pencil on the Assessment Certificate, he arrives at a figure of $133.63 for taxes which he now claims due in lieu of the $214.20 alleged in the petition. On arguing the question of the admissibility of the Certificate of Assessment, which the court was of the opinion was not admissible but which was admitted subject to objection

of defendant, to obviate a possible remander, counsel contended that the defendant company had agreed by the contract to pay the taxes on the land itself for the year 1927. In his brief he had now changed his position, as above indicated.

"In answer to the present contention of counsel for the plaintiffs, counsel for the defendant company refers to the rules of the Louisiana Tax Commission (page 27 of the 17th Annual Report) and points out that it is their rule to have the timber assessed separately from the land where the ownership of the land, and timber is in different parties, under the authority of Globe Lumber Co., Ltd., v. Keete Lockett, Sheriff, 106 La. 414, 30 So. 902; and he contends that if the plaintiffs thought they were paying taxes on timber under their assessment of the land, they had the right, and it was incumbent on them, to request and require the assessor to assess the timber to the defendant; and that they have no right to determine for themselves what the assessed valuation of the timber should be for 1927. The court is inclined to agree with defendant counsel, that the tax on the timber, if any was actually assessed thereon for 1927, cannot be determined in the manner sought to be applied by counsel for plaintiffs; but even if the tax could be ascertained with certainty in this manner, there is another reason why the plaintiffs can not have judgment for any taxes.

"There was no evidence adduced to show that the Andrus Estate or the Andrus Heirs or anybody else actually paid the taxes for 1927 on the assessment for that year. The witness during whose testimony the foregoing certificate and tax receipts were introduced was J. Y. Andrus. He was asked if he had checked the tax records for 1927, to see who paid the taxes on this land in question, and he answered that he had, and that the tax books did not show that Eunice Band Mill had paid the taxes. But he did not testify that the plaintiffs had paid the taxes; and no receipt for the 1927 taxes nor any 1927 tax records were produced by him or anybody else. For aught that the record of this case shows, there is nothing to show that anybody paid the 1927 taxes. So on this item, too, the plaintiffs have failed to sustain their burden of proof.

"At the conclusion of the taking of the evidence, counsel for the plaintiffs moved the court to fix a fee for the 'experts' testifying in this case—referring to his witnesses Roberts and Goss. The court refused to do this, for the reasons that they were not 'experts' as contemplated by Article 441 of the Code of Practice, because they had only testified as to the estimates that they had made themselves, and not as 'persons versed in the knowledge either of a science, an art, or a profession' giving their 'opinion on some point or question on which the decision of a cause depends.' After reviewing the testimony of these two witnesses and examining the authorities cited by counsel in his brief, the court adheres to its refusal to fix any fee for these estimators, beyond the legal fee and mileage to which ordinary witnesses are entitled when regularly subpoenaed.

"For the foregoing reasons:

"It is ordered, adjudged and decreed that plaintiffs' suit be dismissed at their cost."

Judgment is affirmed.

O'NIELL, C. J., does not take part.